# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

ANDREW M.,
      Plaintiff,

      v.

COMMISSIONER OF SOCIAL
SECURITY,
      Defendant.

No. 3:19-cv-01702 (SRU)

## RULING ON CROSS-MOTIONS FOR JUDGMENT ON THE PLEADINGS

In this Social Security appeal, Andrew M. ("Andrew") seeks judicial review of a final

decision of the Commissioner of Social Security ("Commissioner") denying his application for

disability benefits.  Andrew, who suffers from type 1 diabetes, claims that he is disabled because

of symptoms of that disease, and is seeking disability insurance benefits.  His claim was rejected

by an administrative law judge.  Andrew argues that the ALJ failed to fully develop the record

and made improper medical and credibility determinations.  He moves for an order vacating the

decision of the Commissioner and remanding the matter for a new hearing.  The Commissioner

of Social Security moves to affirm the decision.  For the reasons set forth below, Andrew's

Motion for Judgment on the Pleadings (doc. no. 27) is GRANTED and the Commissioner's

Motion to Affirm (doc. no. 29) is DENIED.

## I.      Standard of Review

The Social Security Administration ("SSA") follows a five-step process to evaluate

disability claims.  *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam).  First, the

Commissioner determines whether the claimant currently engages in "substantial gainful

activity."  *Greek v. Colvin*, 802 F.3d 370, 373 n.2 (2d Cir. 2015) (per curiam) (citing 20 C.F.R. §

404.1520(b)). Second, if the claimant is not working, the Commissioner determines whether the

claimant has a "'severe' impairment," i.e., an impairment that limits his or her ability to do work-

related activities (physical or mental). *Id.* (citing 20 C.F.R. §§ 404.1520(c), 404.1521). Third, if

the claimant does not have a severe impairment, the Commissioner determines whether the

impairment is considered "per se disabling" under SSA regulations. *Id.* (citing 20 C.F.R. §§

404.1520(d), 404.1525, 404.1526). If the impairment is not per se disabling, then, before

proceeding to step four, the Commissioner determines the claimant's "residual functional

capacity" based on "all the relevant medical and other evidence of record." *Id.* (citing 20 C.F.R.

§§ 404.1520(a)(4), (e), 404.1545(a)). "Residual functional capacity" is defined as "what the

claimant can still do despite the limitations imposed by his [or her] impairment." *Id.* Fourth, the

Commissioner decides whether the claimant's residual functional capacity allows him or her to

return to "past relevant work." *Id.* (citing 20 C.F.R. §§ 404.1520(e), (f), 404.1560(b)). Fifth, if

the claimant cannot perform past relevant work, the Commissioner determines, "based on the

claimant's residual functional capacity," whether the claimant can do "other work existing in

significant numbers in the national economy." *Id.* (citing 20 C.F.R. §§ 404.1520(g),

404.1560(b)). The process is "sequential," meaning that a petitioner will be judged disabled only

if he or she satisfies all five criteria. *See id.*

The claimant bears the ultimate burden to prove that he or she was disabled "throughout

the period for which benefits are sought," as well as the burden of proof in the first four steps of

the inquiry. *Id.* at 374 (citing 20 C.F.R. § 404.1512(a)); *Selian*, 708 F.3d at 418. If the claimant

passes the first four steps, however, there is a "limited burden shift" to the Commissioner at step

five. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam). At step five, the

Commissioner need only show that "there is work in the national economy that the claimant can

2

do; he [or she] need not provide additional evidence of the claimant's residual functional capacity." *Id.*

In reviewing a decision by the Commissioner, I conduct a "plenary review" of the administrative record but do not decide *de novo* whether a claimant is disabled. *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam); *see Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam) ("[T]he reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."). I may reverse the Commissioner's decision "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek*, 802 F.3d at 374–75. The "substantial evidence" standard is "very deferential," but it requires "more than a mere scintilla." *Brault*, 683 F.3d at 447–48. Rather, substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Greek*, 802 F.3d at 375. Unless the Commissioner relied on an incorrect interpretation of the law, "[i]f there is substantial evidence to support the determination, it must be upheld." *Selian*, 708 F.3d at 417.

## II. Facts

### A. Medical Background

From October 20, 2016 to August 22, 2017, Stephanie Lennon, APRN, ("Lennon") oversaw Andrew's diabetes management at Hartford Healthcare Medical Group in Storrs, Connecticut ("HHMG Storrs"). R. at 243–95. During that time period, Lennon's physical examinations were mostly unremarkable: Andrew denied feeling numbness, tingling, burning or pain in his feet; he did not report experiencing anxiety or depression symptoms; and his mood and affect were normal. R. at 238–39; 260; 266–67; 274; 286–87; 294.

As part of the application process, Andrew underwent a mental health consultative examination with Penelope Guerra Cosentino, Psy.D. ("Cosentino") in October 2017. R. at 301. Cosentino concluded that Andrew had a problem with alcohol use and suffered from mild depression. R. 303. She reported that Andrew was able to "understand, remember, and follow instructions in a work setting." *Id.* Moreover, she determined that Andrew was able to "interact appropriately with co-workers, supervisors, and handle [the] overall pressures of a work setting, providing his medical issues [could] be stabilized." *Id.* She based her assessment on Andrew's medical history, her own observations, the rapport established during the examination, and the results of a Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV) IQ test. R. at 302–03.

From March 2018 to July 2018, the record shows that Andrew sought treatment at Hartford Healthcare Medical Group in Hebron ("HHMG Hebron"). R. at 312–33. On March 23, 2018, Andrew was attended by Dr. Sarah Hilding, M.D., a family medicine physician. He was referred to a plastic surgeon for the removal of a ganglion cyst in the palm of his right hand. R. at 312. He presented no other complaints. Exactly one month later, on April 23, 2018, Andrew reported feeling "crippling" anxiety related to a recent hypoglycemic episode. R. at 313. Andrew reported that he suffered daily panic attacks, as well as a feeling that he was going to die. *Id.* Dr. Kristin S. Gildersleeve, however, observed that Andrew exhibited a normal mood and affect, and his behavior, judgment and thought content were all normal. R. at 314. During the visit, Andrew admitted that he had recently "smoked pot" and "taken cocaine." R. at 313. Dr. Gildersleeve prescribed antidepressant and antianxiety medications, and recommended that Andrew begin seeing a therapist. R. at 313.

On May 4, 2018, Andrew followed up with nurse practitioner Daniela Karanda for medication management. R. at 314. Andrew reported feeling a burning sensation in his feet that

4

kept him awake at night.  R. at 315.  In response, Nurse Karanda added a medication used to treat nerve pain to Andrew's prescription regimen.  *Id.*  Again, Andrew was "encouraged to reach out and establish care with a therapist as medication therapy with cognitive behavioral therapy [would] be optimal in treating his anxiety [rather] than medication alone."  *Id.*  Nurse Karanda observed that, despite reporting feeling nervous and anxious, Andrew was neither hyperactive nor agitated; furthermore, his behavior was normal; his mood and affect were normal; his judgment and thought content were normal; he was not confused; he was fully oriented to person, place, and time; and, he did not report decreased concentration, hallucinations or suicidal thoughts.  R. at 315–16.

On June 4, 2018, Andrew sought treatment from Dr. Gildersleeve for the same complaints.  R. at 316.  Andrew expressed frustration that his anxiety was "barely controlled" given the increased number of prescribed medications.  R. at 317.  The objective findings from that visit show a normal mood and affect, behavior, judgment and thought content.  R. at 317.  Dr. Gildersleeve's treatment notes also include a recommendation, highlighted in bold letters, to "[find] a therapist to work with along with a psychiatrist if possible."  R. at 316.  Andrew responded in turn that he had been unable to find either a psychiatrist or a therapist through his insurance carrier.  R. at 317.

On July 18, 2018, Andrew asked Dr. Gildersleeve to complete his disability paperwork. R. at 332.  The progress notes indicate that at some time between June and July, Andrew started seeing a psychiatrist.  *Id.*  Andrew told his doctor that depression and anxiety prevented him from performing his previous work repairing watches; additionally, he felt that peripheral neuropathy combined with frequent hypoglycemic episodes prevented him from performing work installing hard wood floors.  *Id.*  Dr. Gildersleeve's treatment notes reflect that Andrew was

"unable to work due to his severe anxiety as well as pain from neuropathy and fluctuating sugars with many episodes of hypoglycemia." *Id.* On July 27, 2018, the record indicates that Andrew called HHMG Hebron "freaking out and having suicidal thoughts." R. at 333.

On August 17, 2018, Dr. Hilding, who indicated that she had seen Andrew eight times in the past two years, prepared a report on a Department of Social Services form in which she stated that Andrew was unable to work because his "uncontrolled diabetes with diabetic polyneuropathy prevent[ed] him from standing for an extended period of time." R. at 305. She added that Andrew "also suffer[ed] from extreme anxiety, panic attacks and depression." *Id.* According to the form, Andrew's symptoms began in October 2017. *Id.*

B. Procedural History

On September 1, 2017, Andrew protectively filed an application for Supplemental Security Income benefits, alleging a disability onset of the same date. ALJ Decision, R. at 21. At the time, Andrew was 32 years old. R. at 57. He identified his disability as diabetes and severe depression. Disability Report — Adult, Form SSA-3368, R. at 164. The SSA initially denied his claim on October 24, 2017, and again on reconsideration on March 22, 2018, finding that Andrew's "condition [was] not severe enough to keep [him] from working." Notice of Disapproved Claim, R. at 83; Notice of Reconsideration, R. at 91. Andrew then requested a hearing before an Administrative Law Judge ("ALJ") which was held on October 23, 2018. Tr. of ALJ Hr'g, R. at 44.

C. Hearing

On October 23, 2018 a hearing was held before Administrative Law Judge ("ALJ") Ryan Alger. Tr. of ALJ Hr'g, R. at 44. The ALJ advised Andrew, who appeared *pro se*, that he had a right to representation by counsel, but Andrew agreed to proceed without an attorney. *Id.* at 48.

6

During the seven-minute[1] hearing, Andrew testified that he was a thirty-three-year-old high

school dropout with a GED.  *Id.* at 50.  He had not worked in years.  *Id.*  He testified that he did

not drive and depended on others for transportation.  *Id.* at 51.  Andrew admitted to having some

issues with alcohol and substance abuse.  *Id.* at 53.  He was first diagnosed with diabetes when

he was nine years old.  *Id.* at 51.  Andrew testified that he suffered from diabetic neuropathy—a

type of nerve damage that causes pain in his legs and feet.  *Id.* at 51–52.  He explained that he

has difficulty walking and cannot walk very far.  *Id.* at 52.  As a result, he was prescribed

medication to alleviate the pain in his legs and feet.  *Id.* at 51.  According to Andrew, doctors

have advised him that the nerve damage to his feet is permanent, but he did not specify which

doctors had given him the prognosis, and the ALJ did not ask him about it.  *Id.*  Andrew takes

medication to treat depression, anxiety disorder, and recurrent panic attacks.  *Id.* at 52.  He

testified that he treats at "Hebron Family Services . . . specifically for [his] mental health issues."

*Id.* at 49.  A vocational expert was available to testify at the hearing before the ALJ but was not

asked to do so.  *Id.* at 47.

D.  The ALJ's Decision

On February 8, 2019, the ALJ issued an opinion holding that Andrew was not "under a

disability within the meaning of the Social Security Act since September 1, 2017."  ALJ

Decision, R. at 22.  At the first step, the ALJ found that Andrew "ha[d] not engaged in

substantial gainful activity since September 1, 2017, the application date."  *Id.* at 23.  At the

second step, the ALJ determined that Andrew's impairment of "diabetes mellitus with

neuropathy" was a severe impairment that "significantly limit[ed] [his] ability to perform basic

---

[1] The record shows that the hearing commenced at 10:37 a.m. and closed at 10:44 a.m.  R. at 47–54.  An
unidentified vocational expert was available on the telephone, but never testified.

work activities." *Id*.  Andrew's claimed mental impairments of depression, anxiety, and

substance abuse, however, were not found to be severe, as they "did not cause more than

minimal limitation in [his] ability to perform basic mental work activities." *Id*.  In making that

finding, the ALJ found that Andrew did not meet the criteria of listing 12.04 paragraph B

because Andrew showed only mild limitations in the following areas of mental functioning:  1)

understanding, remembering, or applying information; 2) interacting with others; 3)

concentrating, persisting, or maintaining pace; and 4) adapting or managing oneself.[2]  *Id.* at 24.

At the third step, the ALJ determined that Andrew "[did] not have an impairment or

combination of impairments that [met] or medically equal[ed] the severity of one of the listed

impairments."  *Id.* at 23.  The ALJ then assessed Andrew's residual functional capacity and

found that he could "perform the full range of sedentary work as defined in 20 C.F.R. §

416.967(a)."  *Id*. at 26.  The ALJ determined that Andrew's "medically determinable

impairments could reasonably be expected to cause the alleged symptoms; however, [Andrew's]

statements concerning the intensity, persistence and limiting effects of these symptoms [were]

not entirely consistent with the medical evidence and other evidence in the record."  ALJ

Decision, R. at 28.  As a result, Andrew's statements were found to be inconsistent with the

objective evidence, which according to the ALJ, did not support the level of limitation alleged.

*Id.*

At the fourth step, the ALJ determined that Andrew did not have any past relevant work.

*Id*. at 29.  At the fifth step, the ALJ relied on Medical-Vocational Guidelines ("Grids")[3] to

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04 paragraph B
[3] The functional limitations caused by anxiety and depression are nonexertional limitations. 20 C.F.R. §
404.1569a(c)(i).  "[T]he ALJ cannot rely on the Grids if a non-exertional impairment has any more than a
"negligible" impact on a claimant's ability to perform the full range of work, and instead must obtain the testimony
of a vocational expert."  *Selian*, 708 F.3d at 421.  Because the ALJ determined that Andrew's mental impairments
"did not cause more than minimal limitations," the use of Grids was appropriate under the circumstances.  ALJ
Decision, R. at 23.

determine whether there was work that Andrew could perform despite his impairments.  The

ALJ found that, based on Andrew's age, education, work experience, and residual functional

capacity, "there [were] jobs that exist[ed] in significant numbers in the national economy that

[Andrew could] perform."  *Id*.  Because the ALJ found that Andrew retained the residual

functional capacity for sedentary work, he concluded that "a finding of 'not disabled' [was]

therefore appropriate" and denied Andrew's request for disability benefits.  *Id*. at 30.

## II.  Discussion

At the outset, I note the absence of the following medical records:  (1) the treating

endocrinologist's records; (2) the notes of a treating psychiatrist; and (3) the emergency

department records for the treatment of an acute anxiety episode.  Andrew argues, *inter alia*, that

"[t]he ALJ's finding that [he] has no severe mental impairments is not supported given the

insufficiently developed record on this issue"; furthermore, Andrew contends that the ALJ

"failed to properly develop the record regarding [his] physical limitations due to his diabetes

complications, including diabetic neuropathy and episodes of hypoglycemia."  Pl's Memo., Doc.

27-1, pp. 2, 7.  Because the absence of those records might have affected the outcome of

Andrew's case, I agree with Andrew and, for the reasons set forth below, conclude that the error

was material and merits remand.

### A.  The ALJ Failed to Develop the Record

The Commissioner raises three main arguments: (1) there were no obvious gaps in the

record and, therefore, the ALJ was under no obligation to obtain more information; (2) the ALJ

had sufficient evidence upon which to base his decision; and (3) because the ALJ considered the

combined effects of Andrew's impairments, any error the ALJ made in failing to fully address

either Andrew's mental impairment or his foot neuropathy was harmless and does not warrant a remand.  Def's Memo., Doc. 29, pp. 13, 15–17, 19.  I find none of those arguments persuasive.

The ALJ has an essential duty to "investigate and develop the facts and develop the arguments both for and against the granting of benefits."  *Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 305 (2d Cir. 2011) (internal citations omitted).  That duty is grounded in the Social Security regulations, which provide that the Commissioner will "develop [the claimant's] medical history" and will "make every reasonable effort to help [the claimant] get medical records from [his] own medical sources and entities."  20 C.F.R. § 416.912(b)(1).  It is well-established that the duty to develop the record is heightened when the claimant is proceeding *pro se*.  *Moran v. Astrue*, 569 F.3d 108, 113 (2d Cir. 2009).  In that instance, the ALJ is tasked with safeguarding the claimant's rights by "ensuring that all of the relevant facts [are] sufficiently developed and considered" and by "scrupulously and conscientiously probing into, inquiring of, and exploring for all the relevant facts."  *Id.* (internal citations and alterations omitted); *Lopez v. Sec'y of Dept. of HHS*, 728 F.2d 148, 149–50 (2d Cir. 1984) (holding that "the ALJ has a special duty to protect the rights of a *pro se* claimant [and] . . . [w]hen the ALJ fails to develop the record fully, he does not fulfill this duty and the claimant is deprived of a fair hearing.").  Furthermore, federal courts have a concomitant duty to "make a searching investigation of the record" to ensure that a *pro se* claimant's rights have not been infringed.  *Moran*, 569 F.3d at 113 (citation omitted).  With those principles in mind, I now turn to a consideration of the evidence in the record.

1.   *Gaps in the Record*

a.   Hebron Family Services

The record shows that Andrew was treated at HHMG Hebron by general practitioners Dr. Hilding and Dr. Gildersleeve.  There, he was prescribed medication to treat his various conditions, and those progress notes are part of the administrative record under review.  R. at 312–33.  At several points in the record, however, there are indications that Andrew also treated with a mental health specialist.  But despite Andrew's testimony that he sought treatment from Hebron Family Services for "anxiety, panic attacks, and depression," the record does not include any evidence of treatment by a mental health professional and no records from Hebron Family Services.  Tr. of ALJ Hr'g, R. at 49.  The Commissioner argues that "what [Andrew] calls 'Hebron Family Services' is in fact Hartford Healthcare's Hebron, CT location, where he reported . . . receiving psychiatric treatment, by way of medications, from Dr. Gildersleeve." Def's Memo., Doc. 29, p. 14.   Andrew argues that while "he continued to get treatment at Hartford HealthCare every three months at the time of his hearing . . . [h]e also started mental health treatment at Hebron Family Services . . . ."  Pl's Memo., Doc. 27-2, p. 5.  Having reviewed the record and both arguments, I conclude that the record is not clear with respect to HHMG Hebron and Hebron Family Services.  Accordingly, it was incumbent on the ALJ to either fill the gap in the record with evidence of Andrew's treatment relationship with a mental health professional, or indicate on the record that the Social Security Administration attempted to obtain such documentation and found that none existed.  *Harris v. Saul*, 2019 WL 5703633, at *4 (W.D.N.Y. Nov. 5, 2019) (holding that a missing medical record was not harmless where that record might evidence a competing medical opinion from a treating provider).

Although the record does contain evidence that Andrew was prescribed antianxiety and antidepressant medications at HHMG Hebron, I cannot assume that HHMG Hebron and Hebron

Family Services are one and the same.  During the administrative hearing, both the ALJ and

Andrew made a clear distinction between Hartford Healthcare Medical Group and the Hebron

Clinic.  For example, after Andrew indicated that he was willing to proceed alone during the

hearing, the following colloquy between Andrew and the ALJ took place:

> ALJ:  Okay, so the last few things I have are from Hartford Healthcare Medical Group
> but they're from last year.
>
> CLMT:  Yes.
>
> ALJ:  Do you still go there?
>
> CLMT:  I still do.
>
> ALJ:  And how often?
>
> CLMT:  Every three months.
>
> ALJ:  Okay, so I think what I'll try to do is send out for those updated records so I can
> review those as well and do you go anywhere else for treatment?
>
> CLMT:  I go to Hebron Family Services which is in Hebron Connecticut and I provided
> that information here in some of these papers.

Tr. of ALJ Hr'g, R. at 49.

Second, the record does not support the conclusion that Andrew only sought mental

health treatment from HHMG Hebron as the Commissioner suggests.  Although the

Commissioner asserts that Andrew "repeatedly denied receiving any psychiatric treatment from

anyone other than Dr. Gildersleeve," it appears that he is basing that opinion on forms and

medical records dated before July 2018.  Def's Memo., Doc. 29, p. 15.  Beginning in April 2018,

Andrew reported feeling "like he [was] going to die," and feeling "anxious every day."  R. at

313.  In response, Dr. Gildersleeve recommended that he begin treatment with a therapist.  *Id.*  In

May, Andrew reported visiting the emergency department to treat his recurring panic attacks.[4]
R. at 315.  Daniela Karanda, APRN, encouraged Andrew "to reach out and establish care with a
therapist as medication therapy with cognitive behavioral therapy [would] be optimal in treating
his anxiety [rather] than medication alone."  R. at 314.  In June, Dr. Gildersleeve "highly, highly
recommend[ed] finding a therapist to work with, along with a psychiatrist if possible."  R. at 316.
And finally, on July 18, 2018, Andrew reported that he had begun seeing a psychiatrist.  R. at
332.  Nothing in the record suggests that Andrew relied exclusively on Dr. Gildersleeve for his
mental health treatment, nor was he encouraged to do so.  At best, there is ambiguity regarding
whether HHMG Hebron and Hebron Family Services are one and the same, but even that should
have prompted the ALJ to further develop the record.  *See* SSR 96–8p, Policy Interpretation
Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96–
8p"), 1996 WL 374184, at *7 (S.S.A. July 2, 1996) ("The adjudicator must also explain how any
material inconsistencies or ambiguities in the evidence in the case record were considered and
resolved.").

The Commissioner argues that the ALJ's duty to develop the record is not unlimited.
Def's Memo., Doc. 29, p. 15.  He cites to *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999),
in which the Second Circuit held that "where the ALJ already possesses a 'complete medical
history,' the ALJ is under no obligation to seek additional information."  In my view, that
holding undercuts the Commissioner's argument because it imposes on the ALJ an "affirmative
obligation" to "develop a claimant's medical history," especially "where there are deficiencies in
the record."  *Id.* at 79.  In short, *Rosa* stands for the proposition that an ALJ must fully and fairly
develop the record.  For that reason, I conclude that, as a matter of law, the ALJ cannot

---

[4] Unfortunately, the emergency room visit is not part of the record.

determine that Andrew's mental impairments "cause no more than mild limitation in any of the functional areas" without first attempting to fill the obvious gaps in the record.

The Commissioner also cites to cases where courts have held that remand is not always required when an ALJ fails in his duty to request medical source statements from treating practitioners.  *See Tankisi v. Comm'r of Soc. Sec*., 521 F. App'x 29, 34 (2d Cir. 2013) (the failure of the ALJ to procure formal opinions about a claimant's residual functional capacity does not, by itself, require remand where the medical record is "quite extensive[,] . . . voluminous[,] . . . [and] adequate to permit an informed finding by the ALJ");  *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996) (where the ALJ already possesses a "complete medical history," the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim); *Lowry v. Astrue*, 474 F. App'x 801, 804–05 (2d Cir. 2012) (holding that the ALJ's obligation to re-contact a treating physician is satisfied if the ALJ possesses a sufficiently complete record).  Those cases, however, involve fact patterns in which the ALJ already possessed a complete medical record.  There is nothing to suggest that the ALJ is relieved of his duty to develop the record in the event of a conflict or ambiguity.  Hence, the ALJ had an obligation to resolve the ambiguity between HHMG Hebron and Hebron Family Services and to clarify whether Andrew was under the care of a mental health professional.

b.  Dr. Fadi Al Khayer

Andrew testified that he was diagnosed with insulin-dependent diabetes when he was just nine years old.  Tr. of ALJ Hr'g, R. at 51.  Diabetes, a chronic condition in which the pancreas produces little or no insulin, is generally managed by an endocrinologist.[5]  According to the

---

[5] Mayo Clinic, *Type 1 diabetes - Diagnosis & treatment*, https://www.mayoclinic.org/diseases-conditions/type-1-diabetes/diagnosis-treatment/drc-20353017.

record, Andrew's current endocrinologist is Dr. Fadi Al Khayer.[6]  Disability Report — Adult, Form SSA-3368, R. at 206; R. at 230.  It is reasonable to expect that the records of a diabetes specialist have particular saliency to Andrew's disability claim, which is based in part on complications from diabetes mellitus; yet, I have not found, and the Commissioner has not cited, any records pertaining to Dr. Khayer.  Neither Andrew nor the Commissioner has called attention to the missing records, but when a claimant appears *pro se*, as was the case here, I have "a duty to make a searching investigation of the record to make certain that the claimant's rights have been adequately protected."  *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990) (internal quotation marks omitted) (quoting *Gold v. Sec'y of Health, Ed. & Welfare*, 463 F.2d 38, 43 (2d Cir. 1972)).  If Dr. Khayer saw Andrew during the relevant period, then the missing medical records are potentially relevant to one of the key reasons for finding Andrew not disabled (i.e., his diabetes mellitus with neuropathy was not severe enough to keep him from working).

The relevant period begins with the alleged onset date of September 1, 2017, and ends with the date of the ALJ's decision, February 8, 2019.[7]  Andrew claims that he last saw Dr. Khayer sometime in 2018, which means that Andrew's visits to Dr. Khayer occurred during the relevant period and should have been part of the record.[8]  R. at 207.  This is not a case where the missing medical records were not obvious from the administrative record or had not otherwise been brought to the attention of the ALJ.  *Maes v. Astrue*, 522 F.3d 1093, 1097 (10th Cir. 2008).

---

[6] In his undated Disability Report — Appeal ("Form SSA-3441") (Tr. 204–09), Andrew indicates that Dr. Khayer, an endocrinologist at Connecticut Endocrinology Center, manages his insulin.  R. at 207.
[7] *Frye ex rel. A.O. v. Astrue*, 485 F. App'x 484, 485 n.1 (2d Cir. 2012) (noting that the claimant's application remained in effect until the ALJ's decision was issued); *Patterson v. Comm'r of Soc. Sec.*, 2019 WL 5419535, at *4 (W.D.N.Y. Oct. 23, 2019) ("The relevant time period is defined as the date the application was filed to the date of the ALJ's decision."); *Williams v. Colvin*, 98 F. Supp. 3d 614, 631–32 (W.D.N.Y. 2015) ("The relevant time period for an SSI benefits application is 'the date the SSI application was filed, to . . . the date of the ALJ's decision.'") (quoting *Frye*, 485 F. App'x at 485 n.1).
[8] Although the dates are somewhat illegible, Form SSA-3441 covers a time period after October 31, 2017, and some time during 2018.  R. at 207.

Andrew's condition in and of itself should have alerted the ALJ to the possibility that Andrew also sought treatment from an endocrinologist for the management of his diabetes. What is more, Andrew specifically mentioned Dr. Khayer twice in the record: first, in a Disability Report in which Andrew states that his insulin is managed by Dr. Khayer, an endocrinologist at Connecticut Endocrinology Center, and again on a Recent Medical Treatment form in which Andrew lists a recent visit to Dr. Khayer. R. at 207, 230. Thus, it appears that other treating sources with information on Andrew's diabetic neuropathy may have been overlooked.

It is well settled in this Circuit "that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009) (internal quotation marks and brackets omitted); *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) ("It is the rule in our circuit that 'the ALJ, unlike a judge in a trial, must . . . affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding . . . .'") (quoting *Echevarria v. Secretary of HHS*, 685 F.2d 751, 755 (2d Cir. 1982)). In that vein, Social Security disability determinations are investigatory or "inquisitorial" in nature, "rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 111 (2000); *Butts v. Barnhart*, 388 F.3d 377, 386 (2d Cir. 2004) (internal quotation marks omitted). As a result, "[i]t is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits." *Sims*, 530 U.S. at 111; *Moran*, 569 F.3d at 112–13. That duty is heightened where, as here, the claimant proceeds *pro se* in proceedings before the Commissioner. *See, e.g.*, *Moran*, 569 F.3d at 113; *Hamilton v. Colvin*, 2013 WL 3814291 at *13 (S.D.N.Y. July 23, 2013). It is not clear from the evidence presently before me that Dr. Khayer's records were ever requested, nor has the Commissioner pointed to anything in the record

suggesting otherwise.  Therefore, I must conclude that the ALJ failed in his affirmative duty to develop the administrative record.

Not only did the ALJ fail to request medical records from Andrew's endocrinologist, but he also failed to advise Andrew of his right to collect that opinion.  The ALJ's duty to develop the record, as well as elementary principles of fairness, obligate an ALJ to advise claimants—and particularly those who are proceeding *pro se*—of their right to request medical evidence, including opinions from his or her treating physicians.  *See Cabrera v. Astrue*, 2007 WL 2706276, at *8 (S.D.N.Y. Sept. 18, 2007) ("At the very least, the ALJ has an obligation to inform the claimant of the lack of documentation and of her right to subpoena medical records and reports on her own."); *Valentine v. Comm'r of Soc. Sec.*, 2019 WL 3974576, at *14 (E.D.N.Y. Aug. 21, 2019) ("the ALJ did not make reasonable efforts to obtain the 'relevant clinical data' which could have possibly supported [the treating physician's] opinion.").  The ALJ erred in that respect as well.

### 2.  *Harmless Error*

My inquiry, of course, does not end with a determination that the ALJ committed error by not developing the record.  For the error to warrant remand, the missing evidence must be potentially material.  *See D'Agostino v. Berryhill*, 2020 WL 4218213, at *2 (D. Conn. July 23, 2020); *Pratts*, 94 F.3d at 37 (holding that a "significant gap in the administrative record" warranted remand).  "In other words, remand is not required if the putative error does not prejudice the claimant at subsequent steps of the evaluation process."  *Piotrowski v. Comm'r of Soc. Sec.*, 2019 WL 2266797, at *6 (W.D.N.Y. May 28, 2019).

There are several indications that the defects in the medical records were not harmless, and instead had a real impact on the outcome of Andrew's case.  First, the ALJ determined that

Andrew's depression and anxiety disorder were non-severe impairments after noting that despite "suffering from depression for most of his life, the claimant [was] not in therapy . . . ."  ALJ Decision, R. at 24.  If Andrew was, as he claims, in therapy, then the ALJ relied on a clearly erroneous finding of fact.  But that error does not in and of itself warrant remand if the ALJ's determination applies the correct legal standards and is supported by substantial evidence.  *Cichocki v. Astrue*, 729 F.3d 172, 174 (2d Cir. 2013).  Andrew argues that the ALJ's conclusion is not supported by substantial evidence because "it remains unknown what the behavioral health treatment records demonstrate."  Pl's Memo., Doc. 27-1, p. 4.  The Commissioner argues that the ALJ's decision was supported by substantial evidence because the ALJ obtained medical source statements from Dr. Hilding and Dr. Gildersleeve, Andrew's treating physicians at HHMG Hebron.  Def's Memo., Doc. 29, pp. 15, 17, 24.  That argument fails to recognize the obvious gap in behavioral treatment records to which Andrew refers.  The consultative opinion, as well as Dr. Hilding's and Dr. Gildersleeve's opinions may be probative of Andrew's mental impairments, but they do not provide the full picture, especially when compared with the records of a treating mental health professional.

Next, the ALJ relied heavily on the opinion of a consultative examiner to determine that Andrew's "medically determinable mental impairments cause[d] no more than mild limitations in any of the functional areas."  ALJ's Decision, R. at 21.  Andrew contends that the ALJ erred in relying on that opinion, especially in light of the fact that he "failed to obtain treatment records or opinions from any treating source at Hebron Family Services where [Andrew] stated he [was] receiving his mental health treatment," and instead relied on an opinion from a consultative examining psychologist that Andrew "had no mental limitations in a work environment."  Pl's Memo., Doc. 27-1, p. 2.  Furthermore, Andrew argues that the consultative examination report,

which is dated October 18, 2017, is stale because his condition deteriorated significantly after that.  The Commissioner counters that the failure to consider more recent treatment notes was not fatal to the consultant's opinion because Andrew's primary care physicians, Dr. Gildersleeve and Dr. Hilding, who prescribed his medications, provided medical source statements as recently as July and August of 2018.  Furthermore, he argues that those statements were not persuasive because they did not "bear out this alleged worsening in [Andrew's] condition . . . ."  Def's Memo., Doc. 29, p. 17.   "It is true that medical source opinions that are 'conclusory, stale, and based on an incomplete medical record' may not be substantial evidence to support an ALJ finding."  *Camille v. Colvin*, 104 F. Supp. 3d 329, 343 (W.D.N.Y. 2015) (quoting *Griffith v. Astrue*, 2009 WL 909630, at *9 n.9 (W.D.N.Y. July 27, 2009)).  The timing of the consultative examination report, however, does not on its own render the opinion stale if "there was no significantly new medical evidence produced after [the] opinion that would have likely impacted [the consultant's] opinion."  *Camille,* 104 F. Supp. 3d at 344.  Because the ALJ's determination was made without the benefit of subsequent behavioral health treatment records, it is difficult to gauge whether the missing evidence would have likely "impacted" the ALJ's view of the persuasiveness of the consultant's opinion.  It is reasonable to infer that the recent opinion of a treating mental health provider may have undercut the consultative examiner's opinion, and therefore may have affected the ALJ's decision.  Hence, the error is not harmless and it is incumbent on the ALJ to either fill the gap in the record with evidence or indicate on the record that the Social Security administration attempted to obtain such documentation and found that none exists.

3.   *Substantial Evidence and Subjective Statements*

When "[t]he court has no basis beyond speculation to conclude that the ALJ's decision was supported by substantial evidence or that the proper legal standards were applied . . . remand is required." *Booker v. Astrue*, 2011 WL 3735808, at *5 (N.D.N.Y. Aug. 24, 2011). Given the ambiguities and obvious gaps in the record, however, I remand for further proceedings rather than for an award of benefits.  And because the case is remanded at step two, I need not decide whether the residual functional capacity for sedentary work is supported by substantial evidence or whether the ALJ properly evaluated Andrew's subjective statements, because those determinations will be reconsidered based on remand at step three.  On remand, the Commissioner should evaluate the entire record, including any new evidence concerning Andrew's neuropathy, depression, and anxiety.  Additionally, the Commissioner should reassess whether Andrew's depression and anxiety are negligible.  If that limitation reduces Andrew's ability to find meaningful employment, the Commissioner should obtain testimony from a vocational expert to determine whether, given a non-negligible impairment of anxiety and depression, Andrew is nonetheless able to perform jobs existing in the national economy.

## III.  Conclusion

For the reasons set forth above, Andrew's Motion for Judgment on the Pleadings (doc. no. 27) is GRANTED, and the Commissioner's Motion for an Order Affirming the Decision of the Commissioner (doc. no. 29) is DENIED.  I remand the case to the Commissioner for further development of the record and consideration of any new evidence concerning Andrew's neuropathy, depression, and anxiety.  The Clerk shall enter judgment, effect remand to the Commissioner, and close the case.  The Clerk is further instructed that, if any party subsequently

appeals to this court the decision made after remand, that Social Security appeal shall be assigned to me (as the District Judge who issued the ruling that remanded the case).

So ordered.  Dated at Bridgeport, Connecticut, this 18th day of March 2021.


/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge